STATE of Tennessee, Appellee,

v.

Eric T. HAMMONDS and Doug
Sims, Appellants.

Court of Criminal Appeals,
at Knoxville.

Jan. 21, 1981.

Permission to Appeal Denied by Supreme
Court May 4, 1981.

Howard B. Barnwell, Jr., J. Estes Cocke, Chattanooga, for Hammonds.

Charles P. Dupree, Chattanooga, for Sims.

William M. Leech, Jr., Atty. Gen., William P. Sizer, II, Asst. Atty. Gen., Nashville, Gary Gerbitz, Dist. Atty. Gen., Stephen M. Bevil, Asst. Dist. Atty. Gen., Chattanooga, for appellee.

## OPINION

TATUM, Judge.

The appellants, Eric T. Hammonds and Doug Sims appeal from several convictions. They were both convicted of burglary, armed robbery, and assault to commit murder

in the first degree. Hammonds was also convicted of petit larceny. They were each sentenced to a penitentiary sentence of 25 years for armed robbery and not less than ten nor more than fifteen years for first degree burglary. Hammonds was sentenced to not less than six years nor more than fifteen years for assault to commit first degree murder, and Sims was sentenced to not less than four years nor more than ten years for this offense. Hammonds was sentenced to not less than one year nor more than three years on the petit larceny conviction.

The transcript of the evidence in this case consists of seventeen volumes. Since both appellants attack the sufficiency of the evidence, we will first briefly summarize the evidence contained in this voluminous record.

At approximately 6:00 P.M. on February 14, 1979, the victim, Mrs. Mamie Louise Stephenson, a 74-year-old widow, was driven to her home in Chattanooga by one of her daughters. She testified that as soon as her daughter drove away, she answered a ring of her doorbell and found two young black men standing on her porch; one of the men had a pistol, and the other was armed with two kitchen knives, which belonged to her. They attacked her on the porch, and she remembered nothing else until she had been released from the hospital and awakened in a bed at her daughter's residence. While not positive, she identified Hammonds as being one of the men on her porch. She thought that Hammonds had done yard work for her in the past.

Other proof established that numerous items of merchandise had been taken from the inside of Mrs. Stephenson's home; and her Lincoln automobile, which was parked in the garage, was also taken. Mrs. Stephenson's house had been ransacked. Electrical cords had been cut, and one of the cords had been used to tie the bedroom door shut. There was evidence of blood throughout the house, and a bloody kitchen knife was found on a table.

The victim was able to telephone her daughter after the intruders left. The daughter summoned police who found Mrs. Stephenson lying on her kitchen floor. She had two black eyes, and the flesh between her thumb and forefinger on both hands had been cut in such manner as to evidence that someone had attempted to sever her thumbs. She had a severe stab wound at the base of her neck and three stab wounds in her back. She was conscious but in a state of shock.

At the time and prior thereto, Sims had been living at 1715 University Street in Chattanooga with Aileen Marsh. Percy Leon McCaleb and the defendant, Hammonds, were also staying there at the time. Sims and Marsh gave some of the property taken from Mrs. Stephenson's home to police officers after the crime was committed.

Percy Leon McCaleb testified that the two defendants wanted him to dispose of some property and indicated to him that he should go to a certain apartment which was pointed out to him by the defendants. He went into the apartment and found two boxes containing silverware, a camera, bearskin rug, a black fur-lined coat and other items which he sold for $25.00. This property was later established to be part of the fruits of the crime.

Aileen Marsh testified that at about 6:30 or 7:00 P.M. on the day of the crime, Sims and Hammonds left the apartment to go to a liquor store. About 9:30 P.M., Sims returned to the apartment and, after a brief conversation, started to leave again. As Sims was leaving, Hammonds appeared in a Lincoln automobile which contained a bearskin rug, antiques and numerous other items of personal property, including a black fur-lined coat and a mink coat. At Hammonds' suggestion, he and Marsh took the items upstairs into the apartment. Sims remarked that he wanted no part of the "hot stuff." Sims had told Hammonds to bring the property to this address. Hammonds had been wearing gloves.

Sims said he did not want to have any part of fencing the goods; and the following morning, Hammonds and one of his friends sold part of the property and brought the rest back. Some of it was taken to the empty apartment, and they

agreed to give it to Percy McCaleb. The witness, Marsh, heard Sims and Hammonds say that they had gotten the property from an "old white lady in Brainerd."

Sims told Marsh that he was angry at Hammonds for physically abusing the old white lady by hitting her in the face. On the following Saturday, Marsh heard Hammonds say, "I killed the bitch, the bitch is dead and I'm not scared." Marsh testified that she turned over to police a mink coat, a movie camera, a pocket knife, a silverware box, silverware, and a man's pocket watch, all of which were part of the goods brought to the apartment.

Marsh further testified that Hammonds had told her and Sims before the preliminary hearing that they should "get their stories together." He said that he had a friend who would establish an alibi for him and asked Marsh to tell police that he had "just come over there to get my hair done." Neither Hammonds nor Sims owned an automobile at the time the crime was committed. A quantity of Chevis Regal Scotch, which was taken from Mrs. Stephenson's house, was consumed by Marsh, Sims and Hammonds.

Mrs. Stephenson's Lincoln automobile was later located by police parked about four blocks from the residence at 815 University Avenue where Sims, Marsh, and the others lived. No fingerprints were found in the Stephenson home.

The defendant Hammonds' defense was an alibi. Although his mother lived in the neighborhood of Mrs. Stephenson, he denied being in the Stephenson home or doing any work for her. He testified that on the night that the crime was committed, he visited a restaurant, went to several clubs and attended a party. Two witnesses corroborated his testimony.

Sims testified that he and Hammonds left the apartment and walked to a liquor store. Before reaching the liquor store, they caught a ride on Brainerd Road where they went to a club and had a drink. After leaving the club, they were walking on Brainerd Road past Mrs. Stephenson's residence when Hammonds mentioned that he had done yard work for Mrs. Stephenson and knew that she lived alone and had money. Sims admitted that the two agreed to burglarize Mrs. Stephenson's home.

Sims testified that while he was in the front, Hammonds went to the rear of the home, climbed a tree and broke a window. Afterwards, a car drove up, and they hid until the car drove away.

Sims testified that Mrs. Stephenson came outside to her mailbox, and Hammonds hit her in the face two times. They then opened the closed door and took her into the house; and while Sims was searching for valuables to steal, Hammonds continued to beat Mrs. Stephenson who was in the kitchen. Sims protested to the assault by Hammonds, left the Stephenson residence and returned to the club. After drinking beer, he returned to the Stephenson home to aid Mrs. Stephenson. He found her tied with electrical cord and had a conversation with her. Hammonds was upstairs, and he asked Sims to bring Mrs. Stephenson upstairs. Sims complied with this request despite Mrs. Stephenson's plea begging him not to comply. When they got upstairs, Hammonds hit Mrs. Stephenson again. Sims testified that he interceded on her behalf, but Hammonds drew a machete knife. Sims took her back downstairs, put her on a couch and again left for the club. According to Sims, Mrs. Stephenson had not been stabbed or cut when he left the second time.

Testifying further, Sims said that he drank more at the club, then caught a bus to another place where he drank more and then returned home and entered through the back door. As Sims was about to leave home again, Hammonds arrived and parked the Lincoln automobile in front of their residence. Sims went to another club and drank for another two hours, then went home and saw the stolen items in the apartment. He told Hammonds to get the stolen merchandise out of the apartment; and later, while they were drinking the stolen Chevis Regal, he heard Hammonds say, "I killed a white bitch."

██ Both appellants complain that the evidence is insufficient to support a finding that the burglary was committed at night.

And, for this reason, the convictions for first-degree burglary cannot stand. To convict of first-degree burglary, it must be shown that the entry occurred at night. *Ledger v. State*, 199 Tenn. 155, 285 S.W.2d 130 (1955). Otherwise, the offense is second-degree burglary. *Mullins v. State*, 571 S.W.2d 852 (Tenn.Cr.App.1978), *cert. denied*, 440 U.S. 963, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). T.C.A. §§ 39–901 and 39–903, defining first and second degree burglary, do not define the meaning of the terms "by night" and "by day." In the absence of a statutory definition of nighttime, we think the common law definition as stated in 12A C.J.S. *Burglary* § 26b, page 209 is applicable and correctly stated:

"In the absence of statutory provision to the contrary, the 'nighttime,' within the definition of burglary, is, as was held at common law, that period between sunset and sunrise during which there is not daylight enough by which to discern or identify a man's face, except by artificial light or moonlight. It is not the less nighttime, within the definition of burglary, because the street lamps, or the reflection from the snow, or the moon, or all together, give sufficient light to discern a man's face, but the test is whether there is sufficient daylight. For the purpose of determining nighttime as an element of burglary, it is considered that moonlight or artificial light does not turn night into day, nor can smog or fog turn daytime into nighttime."

Mrs. Stephenson's daughter testified that it was approximately 6:00 P.M. when she brought her mother home. The defendant Sims testified that it was "getting dark" when he and Hammonds arrived at the Stephenson residence. Mrs. Stephenson is the only witness who was questioned directly as to whether the offense occurred by day or by night; she testified that it was "betwixt and between." She also testified that she did not have her lights burning. She did not say that she had difficulty in discerning the defendant's facial features because of darkness. There is no other helpful evidence in the record on this issue. This is insufficient to support the finding that the entry was made by night.

The defendant, Hammonds, pled not guilty to the first-degree burglary indictment and all of the other charges while Sims pled guilty to burglary and not guilty to the other charges. In entering his guilty plea to burglary, he expressly left the degree to be set by the jury. Since the proof does not show that the entry was made at night, the convictions for first-degree burglary are reduced to second-degree burglary.

Sims also argues that he withdrew before the assault to murder was committed and before any goods were taken and therefore was not guilty of armed robbery. He bases this theory upon his own testimony to the effect that he left the premises. First of all, the jury was not bound by his testimony if they did not believe it. *Wyatt v. State*, 4 Tenn.Cr.App. 1, 467 S.W.2d 811 (1971); *Holt v. State*, 210 Tenn. 188, 357 S.W.2d 57 (1962); *Anderson v. State*, 207 Tenn. 486, 341 S.W.2d 385 (1960). Further, the general rule stating the conditions upon which the withdrawal of a party from a criminal act is a valid defense is stated in *People v. King*, 30 Cal.App.2d 185, 85 P.2d 928, 939 (1938):

"Furthermore, in this state the responsibility of one who has counseled and advised the commission of a crime, or engaged in a criminal undertaking, does not cease, unless within time to prevent the commission of the contemplated act he has done everything practicable to prevent its consummation. It is not enough that he may have changed his mind, and tries when too late to avoid responsibility. He will be liable if he fails within time to let the other party know of his withdrawal, and does everything in his power to prevent the commission of the crime."

There was evidence that Sims and Hammonds entered the Stephenson home with Mrs. Stephenson after an assault was committed upon her for the purpose of taking her property in her presence. Sims admitted searching for property while Hammonds continued to assault Mrs. Stephenson. He testified that he left the house and then returned and took Mrs. Stephenson

upstairs against her will where she was again assaulted by Hammonds. He directed that the stolen property be taken to his apartment, drank whiskey that was taken from the Stephenson home and assisted in procuring Percy Leon McCaleb to dispose of some of the property. By Sims' own admission, he attempted to do nothing to prevent the consummation of any of the crimes; and, even if the jury believed Sims' testimony, it could still find that the crimes were not imputable to a cause independent of his acts.

The trial judge correctly stated the law on this subject to the jury:

"Members of the jury, where the perpetration of a felony has been entered on, one who has aided and encouraged its commission may, before its completion, withdraw all his aid and encouragement and escape criminal liability for the completed felony. However, before he can do so, his withdrawal must have been evidenced by acts or words showing his confederates that he disapproves or opposes the contemplated crime. Moreover, it is essential that he withdraw in due time, that he do everything practicable to detach himself from the criminal enterprise and to prevent the consummation of the crime, and that, if committed, it be imputable to some independent cause other than his acts."

The withdrawal issue was submitted to the jury, and it was resolved by them in favor of the State and against Sims. The evidence of Sims' guilt of armed robbery and assault to commit murder meets the standard required by Rule 13(e), Tennessee Rules of Appellate Procedure.

■ Sims also complains of the refusal of the trial judge to grant a special request to instruct the jury on the defense of withdrawal. The special request states, "If you find withdrawal from criminal activity before its completion, you cannot find the withdrawing accused guilty of any activity not yet completed or any acts done by the other actor after withdrawal of the accused." Sims argues that the above-quoted instruction actually given by the trial court "may leave the jury thinking that the de-

fendant who withdrew can be held guilty unless he also does affirmative acts to stop the later acts of another." As above stated, we think that the instruction actually given by the trial judge was proper, that an affirmative duty is required, and that the requested charge did not contain an accurate statement of the law. A trial judge is not in error for refusing to give a requested charge when the requested charge contains an erroneous statement of law. *Capps v. State*, 478 S.W.2d 905, 907 (Tenn.Cr.App. 1972); *Keebler v. State*, 3 Tenn.Cr.App. 447, 463 S.W.2d 151 (1970).

■ The petit larceny conviction of Hammonds was for the stealing of Mrs. Stephenson's automobile. The State failed to prove the value of the automobile; and for this reason, the offense of grand larceny was not submitted to the jury. Hammonds insists that the conviction for larceny cannot stand with the conviction for armed robbery, citing *Keener v. State*, 598 S.W.2d 836 (Tenn.Cr.App.1980). The facts in *Keener* are similar to the facts in the case at bar; however, in the *Keener* case, the proof affirmatively indicated that the keys to the stolen automobile were taken inside the house from the possession of the victim and that the automobile was being loaded with the stolen merchandise during the course of the robbery. In the instant case, the evidence does not show when or how the keys to the automobile were procured or when the stolen merchandise was loaded into the automobile. Under the circumstances of *Keener*, this court held that the taking of the automobile was an element of robbery and dismissed the conviction for the larceny of the automobile. In the case before us, with no evidence as to when the keys to the automobile were procured or no other evidence giving the particulars of the taking of the automobile, we must follow the rationale of *Keener* and release Hammonds of the petit larceny conviction.

■ We have considered the remaining arguments of the defendants on the sufficiency of the evidence but find them to be without merit. Except as to the larceny and first-degree burglary convictions, there

was more than sufficient evidence to convince a rational jury of both defendants' guilt beyond a reasonable doubt of felonious assault, armed robbery and second-degree burglary. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Rule 13(e), Tennessee Rules of Appellate Procedure.

■ Hammonds assigns issue that the trial court erred in not granting his motion for a severance. He argues that since Sims surprisingly pled guilty to burglary and Sims' testimony contradicted his alibi defense, he was entitled to a severance. We observe that Sims' testimony established that he was, in fact, guilty of burglary; therefore, his plea of guilty to this offense could have no bearing upon the jury in relation to Hammonds. There was no evidence introduced against Hammonds in this trial that was not admissible against him in a separate trial, including the testimony of Sims. A severance was not necessary to achieve a fair determination of Hammonds' guilt or innocence, and he was not unfairly prejudiced. For these reasons, this issue must be overruled. Rule 14(c)(2), Tennessee Rules of Criminal Procedure; *Woodruff v. State*, 164 Tenn. 530, 538, 51 S.W.2d 843, 845 (1932).

Sims complains that the District Attorney General exercised seven of the State's peremptory challenges by excluding black persons from the jury. The District Attorney General stated that his reason for excluding these seven persons from the jury was because they were all acquainted with Hammonds' principal alibi witness. The State had eight peremptory challenges, and two black persons were retained on the jury.

■ The law is well established in Tennessee that the State or the defense may exercise peremptory challenges with complete discretion. There is no requirement that a party justify his exercise of peremptory challenges. *Wheeler v. State*, 539 S.W.2d 812, 815–16 (Tenn.Cr.App.1976); *Johnson v. State*, 3 Tenn.Cr.App. 17, 456 S.W.2d 864, 866 (1970).

■ In issue four, Sims contends that the trial judge erred in not assigning separate counsel tables for each defendant and makes other argument that the jury could not determine which attorney represented him. The record leaves no doubt that the jury understood which attorney represented each defendant. There is no merit in issue four.

■ Hammonds insists that the State suppressed exculpatory fingerprint evidence, citing *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He contends that there was a fingerprint in the victim's automobile and theorizes that this fingerprint might have been that of Aileen Marsh. His theory is that if the fingerprint were that of Marsh, then this was evidence that Marsh aided and abetted Sims, not him. There was no competent evidence that any fingerprint was found in the victim's car. However, if we were to assume that Marsh's fingerprint were found in the car, this would prove nothing since Marsh admitted being in the car and assisting Hammonds in unloading the stolen merchandise at the University Street address. Hammonds offered proof to show that there was a fingerprint inside the automobile, but the trial judge correctly declined to admit it because it was obviously hearsay.

■ He next insists that there were bloody fingerprints on the butcherknife found in the victim's kitchen. He speculates that this might have been that of Aileen Marsh. Hammonds did not comply with Rule 27(g), Tennessee Rules of Appellate Procedure by citing the page on which this evidence could be found. We have been unable to locate any testimony that bloody fingerprints were on the knife.

The evidence affirmatively indicated that no fingerprints of either defendant were found in the victim's home. There was uncontradicted evidence that the intruders were both wearing gloves when the crimes were committed. We find no evidence that the State suppressed exculpatory or material evidence and overrule this issue.

■ Finally, Hammonds insists that the trial court abused his discretion in ordering his sentences to run consecutively. In ordering consecutive sentences, the trial court

stated: "Mr. Hammonds is a dangerous offender as defined in *Gray v. State*. It was a vicious crime, and I just don't find any redeeming qualities in him."

*Gray v. State*, 538 S.W.2d 391 (Tenn.1976) holds that when a defendant is convicted of two or more inherently dangerous crimes, consecutive sentences should not be ordered except when the circumstances of the crimes are aggravated. Armed robbery and assault to commit first degree murder are inherently dangerous crimes, but we find aggravated circumstances, as did the trial judge; therefore, consecutive sentences were authorized under the "dangerous offender" criteria as defined in *Gray*. This elderly, helpless lady was beaten severely about the face and assaulted numerous times with a knife in her own home. The evidence supports the inference that her attacker was willfully torturing her by attempting to sever both thumbs from her hands. She offered no resistance to her attacker, and there was absolutely no color of provocation or excuse for the maltreatment of the victim as in this case. We do not find that the trial judge abused his discretion in ordering Hammonds' sentences to run consecutively.

It results that the convictions of both defendants for first-degree burglary are reduced to second-degree burglary. If the State agrees, the punishment for second-degree burglary will be fixed at not more or less than 3 years for each defendant; if the State does not agree, the trial judge is directed to conduct a hearing for the sole purpose of fixing punishment for second-degree burglary. The judgment of conviction against Hammonds for petit larceny is reversed and dismissed. The judgments are in all other respects affirmed as to both defendants. The case is remanded for further proceeding consistent with this opinion.

DWYER and CORNELIUS, JJ., concur.