IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 3, 2009

## STATE OF TENNESSEE v. CHRISTOPHER ANDERSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-04926     Paula Skahan, Judge**

---

**No. W2008-00562-CCA-R3-CD  -  Filed July 23, 2009**

---

The defendant, Christopher Anderson, was convicted by a Shelby County jury on one count of aggravated burglary, a Class C felony, and two counts of aggravated robbery, Class B felonies. The defendant received sentences of three years for aggravated burglary and eight years for each count of aggravated robbery to be served concurrently in the Tennessee Department of Correction. On appeal, the defendant raises the following issues: (1) whether the trial court erred in denying the defendant's motion to sever his cases from the cases of his co-defendant; (2) whether the trial court erred in denying the defendant's motion for judgment of acquittal as to Count III, charging aggravated robbery; (3) whether the evidence presented at the trial was sufficient to support the defendant's convictions; and (4) whether the trial court erred in excluding defense counsel's inquiry on cross-examination of the co-defendant regarding bias. Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Randall B. Tolley (on appeal) and Cornelius Bostick (at trial) for the appellant, Christopher Anderson.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; William L. Gibbons, District Attorney General; and Kevin Rardin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant and co-defendant, Charles Bennett, were indicted on one count of aggravated burglary and two counts of aggravated robbery. The following pertinent testimony was presented at their joint trial. William Morgan, the victim identified in Counts I and II of the indictment, testified that in July of 2004, he lived at 1758 Robin Hood Lane. He knew the co-defendant from

his place of employment, Memphis Pool Supply. On July 23rd, Mr. Morgan invited some friends to his house for a small party. When he arrived home around 4:30 p.m., James Caughlin, Matthew Pennington, Ashley Lopez, and the co-defendant were already at his residence. That evening, Mr. Morgan and his guests, "sat around, hung out, and got some drinks." Later in the evening, Mr. Morgan felt ill and went to his bedroom to lie down. While resting, he heard Ms. Lopez call out from the kitchen. He went to the kitchen to investigate and Ms. Lopez told him that the co-defendant had tried to expose himself to her. Mr. Morgan told the co-defendant he would have to behave or leave. Mr. Morgan recalled the co-defendant was quite drunk at the time. A few minutes later, Mr. Morgan found the co-defendant on the kitchen floor, holding a bottle of Jagermeister, a liquor, and mumbling to himself. Mr. Morgan told the co-defendant to leave but he refused and became violent. At this time, Mr. Morgan forced the co-defendant out the front door of the house. In response, the co-defendant lunged at Mr. Morgan. Mr. Morgan used a taser on the co-defendant three times. The co-defendant finally left the house, yelling, "[y]ou're going to be sorry. You don't know what you've done. I'm going to kill you." Approximately fifteen minutes later, the co-defendant's parents came by the house looking for the co-defendant.

Mr. Morgan testified that a few hours later, at around 1:00 a.m., the co-defendant returned to his house and stated he wanted his bottle of liquor. As Mr. Morgan spoke to the co-defendant through the screen door, an African American man, identified by Mr. Morgan at trial as the defendant, came onto the porch and asked for a cigarette. The defendant then pointed a machine gun about nine inches from Mr. Morgan's face, "put the clip in [the gun] and chambered a bullet." Mr. Morgan stated that he and Matthew Pennington tried to disarm the defendant, however, they were not successful and the defendant and two other men forced their way into the house. According to Mr. Morgan, they started "rummaging through stuff and asking about dope," ripped the PlayStation 2 out of the wall, smashed the entertainment center, and told Mr. Morgan to empty his pockets. The men took Mr. Morgan's money and pocket knife. Three days later, Mr. Morgan went to the police station and identified the defendant and the co-defendant in photographic lineups. Mr. Morgan's statement and the photographic lineups were made exhibits at the trial. Mr. Morgan stated that the porch and the living room were well lit and he was sure that the man who pointed the machine gun at him was the defendant.

On cross-examination, Mr. Morgan acknowledged that he was under the influence of alcohol when he saw the defendant for the first time. He admitted that in the past he had used marijuana and had been in possession of Xanax.

James Caughlin, named as the victim in Count III of the indictment, testified that on Friday, July 23, 2004, he was among several friends who gathered at Mr. Morgan's house, located at 1758 Robin Hood Lane in Memphis. The group was visiting and drinking beer. Mr. Caughlin stated that during the evening, he drank beer and Jagermeister. He believed that the co-defendant drank beer and most of one of the two bottles of Jagermeister that he brought with him. As the evening progressed, the co-defendant became drunk and belligerent. Mr. Caughlin stated that he left the house to get something to eat and when he returned, the co-defendant was no longer at the house. Several hours later, the co-defendant returned to the house, knocked on the front door, and asked for

his bottle of Jagermeister, which had been broken earlier in the evening. Mr. Cauglin recalled that he did not allow the co-defendant into the house and asked the co-defendant to leave. Three African American men came onto the front porch. One of the men asked for a cigarette then stuck a machine gun three inches from Mr. Caughlin's nose. The man holding the "Uzi type" gun stepped off the porch into the front yard and someone grabbed Mr. Caughlin and threw him off the porch. Mr. Caughlin stated that the men entered the house through the front door and he went around the house and entered through the back door. As Mr. Caughlin came into the living room, he saw two men "rummaging through the living room, picking up stuff, tossing a pistol back and forth between the two of them." According to Mr. Caughlin, the co-defendant's name and drugs were mentioned and the men appeared to be looking for drugs.

Mr. Caughlin testified that the men took a set of his throwing knives and his watch. Immediately after they left, he called the police. On July 27, 2004, Mr. Caughlin went to the robbery office of the Memphis Police Department where he gave a statement and identified the co-defendant in a photographic lineup. Mr. Caughlin said he eventually recovered his watch but did not recover his knives. On cross-examination, Mr. Caughlin confirmed that although the police showed him a photographic lineup of other possible suspects, he was not able to identify anyone other than the co-defendant as a participant in the robbery.

Ashley Lopez testified that on July 23, 2004, she and her boyfriend, Mr. Pennington, were at the residence of Mr. Morgan along with Mr. Caughlin and a few other friends when Mr. Morgan and the co-defendant arrived. The co-defendant began drinking and became confrontational. Ms. Lopez said that at one point, she went to the kitchen and saw that the co-defendant had spilled liquor on the floor. The co-defendant told Ms. Lopez that he was bleeding and began to undo his pants. Ms. Lopez called out for Mr. Pennington and Mr. Morgan, who came into the kitchen and told the co-defendant to leave. The co-defendant raised a bottle of Jagermeister to hit Mr. Pennington, and Mr. Pennington knocked the bottle away. Mr. Pennington and Mr. Morgan escorted the co-defendant out of the house and into the front yard. When the co-defendant would not leave, Mr. Morgan used a taser on him. According to Ms. Lopez, she had taken the taser out of her purse earlier in the evening and Mr. Morgan picked it up from a table on his way out of the house. Shortly after the co-defendant left, the co-defendant's parents came to the house looking for him.

Ms. Lopez stated that at about 1:30 a.m., there was a knock on the door and Mr. Caughlin or Mr. Morgan opened the door. Ms. Lopez heard the co-defendant ask for his bottle of Jagermeister and saw three African American men on the sidewalk in front of the house. The men came onto the front porch, kicked in the front door, and entered the house. One man had a pistol and another man had a machine gun. Ms. Lopez heard someone ask who hit the co-defendant and where they had "the dope." During the incident, one man held Mr. Caughlin and Mr. Pennington outside at gunpoint. Ms. Lopez stated that the men took a PlayStation and twenty to thirty DVDs. On cross-examination, Ms. Lopez confirmed that she did not see the co-defendant enter the house during the robbery.

Matthew Pennington testified that on July 23, 2004, he and Ms. Lopez were in the process of moving into the house on Robin Hood Lane with Mr. Morgan. There were a few friends gathered

at the house and they were drinking. The co-defendant became drunk, angry, and argumentative. At one point in the evening, Mr. Pennington heard yelling from the kitchen between the co-defendant and Ms. Lopez. Mr. Pennington and Mr. Morgan entered the kitchen and Ms. Lopez said the co-defendant tried to expose himself to her. Mr. Morgan told the co-defendant to leave and the co-defendant asked for his bottle of Jagermeister. When Mr. Pennington gave the co-defendant the unopened bottle of Jagermeister, the co-defendant tried to hit him with it. Mr. Pennington knocked the bottle out of the co-defendant's hands and the bottle broke on the kitchen floor. Mr. Morgan grabbed the co-defendant and pushed him out of the door. Once outside, the co-defendant again tried to hit Mr. Pennington. Mr. Morgan used a taser on him and the co-defendant left. Between 1:00 and 2:00 a.m., Mr. Pennington heard pounding on the front door. Mr. Caughlin opened the door and the co-defendant was on the porch with three African American men. One of the men had a pistol and another had a machine gun. The men pushed their way into the house and the man with the machine gun pulled a clip out of his sweatshirt and loaded and cocked the gun. The men were yelling and asking for "weed." Mr. Pennington stated that he and Mr. Morgan tried to grab the machine gun and the man with the pistol took them outside. During the robbery, the co-defendant remained on the porch and stood at the front door. Items stolen during the robbery included a PlayStation 2 console, some DVDs, an entertainment unit, Mr. Morgan's money, and Mr. Caughlin's watch. On cross-examination, Mr. Pennington denied that they smoked marijuana that night or that there was "hydro marijuana" at the house.

Joe Stark with the Memphis Police Department testified that on July 27, 2004, Mr. Morgan identified the defendant and the co-defendant in photographic lineups. Sergeant Stark stated that Mr. Morgan identified the photograph of the defendant without hesitating and said, "that's the guy with the machine gun." After the co-defendant was advised of his *Miranda* rights, he told Sergeant Stark that Mr. Caughlin's watch was under the couch in his bedroom. Sergeant Stark went to 7556 Lowrence Road, the co-defendant's residence, and he obtained consent from the co-defendant's parents to search the residence. Mr. Caughlin's watch was found under the couch in the co-defendant's bedroom and was returned to Mr. Caughlin the following day.

On cross-examination, Sergeant Stark testified that on August 14, 2004, the defendant was brought in for questioning and denied having any involvement in the July 24th robbery. Sergeant Stark stated that the co-defendant initially denied going back to Mr. Morgan's residence. However, later, the co-defendant admitted he had been at Mr. Morgan's residence during the robbery. Sergeant Stark stated that the co-defendant and the defendant lived in houses located next to each other on Lowrence Road.

Barney Anderson, the defendant's father, testified that in 2004, the defendant lived at home and did not have a car. The defendant was not allowed to drive his parents' cars because he was not covered by their insurance. The defendant had to be at home by 11:30 p.m. on Friday nights because he usually worked Saturday mornings. According to Mr. Anderson, the defendant did not leave the house after curfew on July 23rd. Mr. Anderson testified he usually went to bed about 1:00 a.m. He claimed he would have known if the defendant left the house because he would have heard the garage door and the dog barking. On cross-examination, Mr. Anderson agreed that the co-

-4-

defendant's family had lived in the house next door to the Anderson's house for ten years. He agreed that he would have been asleep in the early morning hours of July 24th and that he had no independent memory of the defendant's actions on that day.

The defendant testified on his own behalf stating that in July of 2004, he was working for his father's painting business. He usually left work at about 4:00 p.m. on Fridays and did not go out on Friday nights because he had to be at work early Saturday mornings. On the morning of July 24th, the co-defendant came to the defendant's house between 1:00 and 1:15 a.m. The co-defendant looked like he had been in a fight and was drunk. According to the defendant, the co-defendant left after ten to fifteen minutes. The defendant did not leave with the co-defendant and was careful to be quiet because it was against the house rules to have guests after midnight. The defendant claimed that prior to July 24th, Mr. Morgan saw him "hanging out" at the co-defendant's house. The defendant acknowledged that in 2005, he pled guilty to theft of property less than $500.

On cross-examination, the defendant stated that he had known the co-defendant for ten years and they socialized together. He agreed that he spoke to the police on August 14, 2004, and identified a waiver of rights form with his signature. The defendant stated that he did not remember telling the police that the co-defendant's mother called him and asked him to keep the co-defendant at his house on July 24th, but he admitted that such a call was possible. The defendant testified that Mr. Morgan was mistaken in identifying him as having been at the residence on Robin Hood Lane on the morning of July 24th.

William Bennett, the co-defendant's father testified that on July 23, 2004, the co-defendant was living at home. At about 6:00 p.m., Mr. Bennett and his wife drove the co-defendant to a residence on Robin Hood Lane. At about 11:00 p.m., Mr. Bennett received a telephone call from the co-defendant. Accompanied by his wife, Mr. Bennett drove to a gas station to pick up the co-defendant. The co-defendant was upset and showed them six to eight whelps on his body and a bad bruise on his shoulder. Mr. Bennett knew from his appearance that the co-defendant had been drinking, but the co-defendant was not staggering or slurring his speech. On cross-examination, Mr. Bennett confirmed that he went back to the house on Robin Hood Lane after the co-defendant called him.

The co-defendant testified that in July of 2004, he worked at Memphis Pool Supply with Mr. Morgan. The co-defendant visited Mr. Morgan's house two days before Friday, July 23rd and met Ms. Lopez and Mr. Pennington. On Friday, July 23rd, when the co-defendant arrived at Mr. Morgan's house for a party, Ms. Lopez and Mr. Pennington were already there. About thirty minutes later, Mr. Caughlin and Mr. Morgan arrived. The co-defendant recalled that he got a ride to the store and bought five six packs of beer. They were also smoking Mr. Pennington's "hydro marijuana" and Mr. Morgan had some Xanax. Mr. Pennington went to the liquor store and bought Jagermeister with the co-defendant's money. The co-defendant acknowledged that he was impaired, but denied that he was belligerent. According to the co-defendant, Mr. Pennington was drunk and accused the co-defendant of flirting with Ms. Lopez.

A confrontation occurred when Mr. Pennington and Mr. Morgan approached the co-defendant in the kitchen and accused him of grabbing Ms. Lopez. Mr. Pennington pushed the co-defendant and then hit him with a taser. According to the co-defendant, he was hit four or five times with the taser as he walked through the living room. The co-defendant claimed that he was also hit with a stick and kicked. Because his telephone was not working, the co-defendant walked to a gas station and asked the clerk to call his parents.

The co-defendant stated that his parents picked him up from the gas station. After he arrived home, he met the defendant outside and asked him for a ride back to Mr. Morgan's house. The defendant went back into his house, but returned with two other men, whom the co-defendant knew as "Black" and "Mike." The co-defendant, the defendant, Mike, and Black rode in Black's vehicle to Mr. Morgan's house. The co-defendant stated that he exited the car, walked up to the front porch, and knocked on the door. Mr. Pennington answered the door and the co-defendant asked to speak with Mr. Morgan. The co-defendant stated that he only wanted to get an apology and to make sure his job was secure. From behind him, the co-defendant heard someone ask for a light for a cigarette. Mr. Morgan refused. When asked again for a light, Mr. Morgan refused using a racial slur and the situation became hostile. Someone came from behind the co-defendant with a gun and entered the house. The co-defendant stated he did not enter the house and did not have a gun. During the robbery, the defendant stood in the front yard holding a gun on Mr. Pennington. After the robbery, the co-defendant found Mr. Caughlin's watch on the car seat and took it with the intention of returning it to Mr. Caughlin.

The co-defendant testified that a few days later, he gave a statement to police and was charged. He met with an investigator from the attorney general's office and identified the defendant and two other men as being involved in the robbery. The co-defendant claimed that after he was charged, the defendant approached him on two separate occasions and warned him not to identify him as being involved. The defendant then asked him what he was going to tell the police. The co-defendant told the defendant that he would tell the police that the defendant did not enter the house. However, the defendant indicated that was not good enough. The co-defendant explained he eventually signed a statement for the defendant indicating that the defendant was not involved in the robbery because he felt his family had been threatened.

On cross-examination, the co-defendant admitted that on July 26, 2004, he did not tell the police the truth. The co-defendant claimed that the defendant was mistaken in saying that prior to the robbery, Mr. Morgan had seen the defendant at the co-defendant's house. The co-defendant stated that Mr. Morgan had never been to his house.

Robin Boyd, called by the defendant's counsel as a rebuttal witness, testified that she witnessed a conversation between the defendant and the co-defendant regarding the robbery. According to Ms. Boyd, the co-defendant said to the defendant, "[w]ell, man, I'm sorry I had to give your name to the police so I could get out. That's the only way they would get me out. I'll write a statement and sign my name saying you didn't have anything to do with it." The co-defendant wrote

-6-

out his statement, signed his name, and wrote the date. Ms. Boyd signed the statement as a witness. On cross-examination, Ms. Boyd stated she did not see the defendant threaten the co-defendant.

On re-direct examination, the co-defendant again testified that he wrote the statement saying that the defendant had nothing to do with the robbery because he had been threatened. The co-defendant stated that the defendant had threatened him prior to the conversation witnessed by Ms. Boyd. According to the co-defendant, at the time he gave the statement to the defendant, he had already made a contrary statement to the police.

The jury found the defendant guilty as charged and he was subsequently sentenced. The defendant has appealed.

ANALYSIS

I. Severance

The defendant claims the trial court erred in failing to sever his trial from the trial of the co-defendant. The practice of prosecuting co-defendants together is "aimed at achieving improved judicial economy and efficiency." *See* Tenn. R. Crim. P. 8, Committee Cmts. "According to Tennessee Rule of Criminal Procedure 14(c)(2)(ii), a trial court must sever the defendants during a trial if 'necessary to achieve a fair determination of the guilt or innocence of one or more defendants.'" *State v. Mickens*, 123 S.W.3d 355, 383 (Tenn. Crim. App. 2003). The decision whether to grant a severance lies within the sound discretion of the trial court. *State v. Meeks*, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993); *State v. Coleman*, 619 S.W.2d 112, 116 (Tenn. 1981). On appeal, we review this issue for abuse of discretion. *See State v. Shirley*, 6 S.W.3d 243, 246-47 (Tenn. 1999) (adopting abuse of discretion review for cases involving severance of offenses). In determining whether the trial court has abused its discretion in denying a defendant's motion for severance from his or her co-defendants, "[t]he record must demonstrate that 'the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty,' before an accused is entitled to a reversal of his conviction." *Id*. (quoting *State v. Burton,* 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988)).

Prior to the trial, the defendant moved to sever his case from the co-defendant's case. The defendant's counsel argued that severance was appropriate because the co-defendant's statements to police incriminated the defendant. In a pretrial hearing, the state indicated the co-defendant's statement would not be used or would be redacted unless the co-defendant testified. The trial court denied the defendant's motion to sever.

In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court prohibited the use of a statement of a non-testifying co-defendant which incriminates a defendant. *see also State v. Ogle*, 666 S.W.2d 58, 60 (Tenn. 1984) (application by the Tennessee Supreme Court of the holding in *Bruton*). Rule 14 of the Rules of Criminal Procedure addresses the procedure to be followed when a *Bruton* issue arises. "Subdivision (c)(1)(i) and (ii) contain provisions making severance unnecessary where no *Bruton* violation would follow, as would be true, for example, where the

confessing co-defendant testifies or where redaction eliminates any prejudice to the non-confessing co-defendant." *State v. Mitchell Richardson,* No. E2006-01580-CCA-R3-CD, 2008 WL 2037274, at *8 (Tenn. Crim. App, at Knoxville, May 13, 2008), *perm. app. denied* (Tenn. Dec. 8, 2008). In the instant case, the co-defendant testified at the trial, thereby eliminating any chance of a *Bruton* violation. *See id*; *and* Tenn. R. Crim. P. 14(c)(1)(i) and (ii) and Committee Cmts.

On appeal, the defendant argues that circumstances arose during selection of the jury and at the trial that required severance for a fair determination of his guilt or innocence. Specifically, the defendant avers that the co-defendant was approached during jury selection and asked if he had been to the Penal Farm. He also asserts that the co-defendant's sister approached state witnesses, made antagonistic comments, and accused them of being "dope smoker's." The defendant further asserts that the defenses of the defendant and the co-defendant were contentious and that the co-defendant's testimony was "incredulous." The defendant argues that the cumulative effect of these circumstances was highly prejudicial to him and necessitated a severance.

We disagree. First, the defendant has not shown prejudice as a result of a juror's inquiry as to whether the co-defendant had been to the Penal Farm. The record indicates that the co-defendant did not respond to the juror's inquiry and the incidence was immediately reported to the trial court. We note that the defendant made no motion for severance at the time that the incident was brought to the attention of the court. Second, with regard to the co-defendant's sister's alleged antagonistic comments to witnesses, we again note that the defendant has not shown prejudice. The exchange was immediately brought to the attention of the trial court and the court admonished the co-defendant and his family to avoid contact with the witnesses and the jurors. There is no indication that the testimony of the witnesses was impacted by the alleged comments. Additionally, the record contains no further report of inappropriate interaction involving witnesses or jurors. Third, in our view, the alleged contentiousness between the two defendants was not sufficient to deprive the defendant of "a fair determination of [his] guilt or innocence." *See* Tenn. R. Crim. P. 14(c)(2)(ii); *see also Zafiro v. United States*, 506 U.S. 534, 538 (1993) (holding that "[m]utually antagonistic defenses are not prejudicial *per se* "). All of the evidence introduced against the defendant in this trial, including the testimony of the co-defendant, would have been admissible against him in a separate trial. "[A] severance need not be granted where the evidence which was introduced could have been admitted against [the defendant] in a separate trial." *State v. Little*, 854 S.W.2d 643, 648 (Tenn. Crim. App. 1992); *see also State v. Hammonds*, 616 S.W.2d 890, 896 (Tenn. Crim. App. 1981). Additionally, the trial court instructed the jury to give separate consideration to each defendant. We must presume that the jury followed the charge given. *State v. Barton*, 626 S.W.2d 296, 298 (Tenn. Crim. App. 1981); *see also State v. Kyger*, 787 S.W.2d 13, 20 (Tenn. Crim. App. 1990) (holding that there was no error in failure to sever where the trial court instructed the jury to consider the evidence against each defendant individually). Finally, without citing any supporting authority, the defendant asserts that the "incredulous" testimony of the co-defendant supported his motion to sever. We disagree. Questions about the credibility of witnesses who make identifications are questions properly left to the jury. *See State v. Robert Donterious Conner,* No. M2007-01619-CCA-R3-CD, 2008 WL 4614449, at *9 (Tenn. Crim. App., at Nashville, Oct. 17, 2008) (addressing issue of sufficiency of the evidence to support convictions for second degree

murder and aggravated assault) (citing *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003)). Therefore, we conclude that the trial court did not abuse its discretion in denying the defendant's motion for severance. The defendant is not entitled to relief on this issue.

## II. Motion for Judgment of Acquittal

The defendant asserts that the trial court erred in denying his motion for judgment of acquittal on the charge of aggravated robbery involving Mr. Caughlin arguing, "James Caughlin did not identify [the defendant] as the individual who robbed him with a gun" and "the state did not present any proof that [the defendant] was the person that was directly responsible for taking the victim's watch and knife."

Rule 29 of the Tennessee Rules of Criminal Procedure provides that the trial court shall enter an order of judgment of acquittal of one or more offenses charged in the indictment after the evidence on either side is closed if the evidence is insufficient to sustain a conviction. This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the state rests or at the conclusion of all the evidence. *See generally Overturf v. State*, 571 S.W.2d 837 (Tenn. 1978). At the point the motion is made, the trial court must favor the opponent of the motion with the strongest legitimate view of the evidence, including all reasonable inferences, and discard any countervailing evidence. *Hill v. State*, 470 S.W.2d 853, 858 (Tenn. Crim. App. 1971).

At the conclusion of the state's proof, the defendant moved for a judgment of acquittal on Count III of the indictment. The trial court denied the motion and noted that one witness had positively identified the defendant as having committed armed robbery against Mr. Caughlin. The trial court ruled that, viewed in a light most favorable to the state, the evidence was sufficient for the jury to consider the charges in Count III against the defendant.

Relevant to Count III of the indictment in this case, "[r]obbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). The offense becomes aggravated robbery when, "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; or [w]here the victim suffers serious bodily injury." *Id*. § 39-13-402(a).

At the conclusion of the state's case, the evidence established that the co-defendant yelled threats upon leaving Mr. Morgan's residence and later returned to the residence accompanied by three men. Evidence further showed that two of the men were armed with guns and that a robbery ensued. Mr. Morgan, also a victim in the robbery, identified the defendant at the trial as having accompanied the co-defendant to his residence on the morning of July 24, 2004. Mr. Morgan stated that the light on the porch and in the living room was good and that he was sure that the man who pointed the machine gun at him was the defendant. About three days following the robbery, Mr. Morgan went to the police station and identified the defendant and the co-defendant in photographic lineups as two of the men present at the robbery. In overruling the defendant's motion for a judgment of acquittal, the trial court noted that the defendant had been identified as an accomplice

in the robbery. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999). The identity of an accused may be established by either direct evidence, circumstantial evidence, or a combination of the two. *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). The determination of identity is a question of fact for the jury to determine after consideration of all the evidence. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). Accordingly, we conclude that the evidence supporting the defendant's identity as an accomplice in the robbery was sufficient to overcome the defendant's motion.

The defendant also asserts that on his motion for judgment of acquittal on Count III, the trial court erred because the state did not prove that he was directly responsible for taking Mr. Caughlin's property. We disagree. The evidence supported the defendant's involvement in the robbery and it was not necessary for the state to show that the defendant personally took property from Mr. Caughlin. Mr. Caughlin testified that during the robbery, he was thrown from the porch by a man with an "Uzi type" gun and his watch was taken. Mr. Caughlin's watch was later found in the co-defendant's room. The trial court allowed the jury to consider the charge of aggravated robbery involving Mr. Caughlin on the theory of criminal responsibility. A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). Criminal responsibility is not a separate crime but instead a theory by which the state may prove the defendant's guilt based upon another person's conduct. *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003). We concluded that the evidence was sufficient to support the jury's consideration of the defendant's guilt on the charge of the aggravated robbery of Mr. Caughlin. Therefore, the trial court did not err in denying the defendant's motion for judgment of acquittal and the defendant is without relief on this issue.

### III. Sufficiency of the Evidence

The defendant asserts that the evidence was insufficient to support his convictions. It is well-established that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans,* 108 S.W.3d 231, 236 (Tenn. 2003); *see also* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues

raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

To sustain the defendant's conviction for aggravated burglary in this case, the state was required to prove that the defendant entered Mr. Morgan's house, without his consent, and with the intent to commit theft. *See* Tenn. Code Ann. §§ 39-14-402, -403. "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id*. § 39-14-103. To sustain the defendant's convictions for aggravated robbery, the state was required to prove that the defendant committed an intentional or knowing theft of property from the person of another using violence or fear and that the theft was accomplished with a deadly weapon or an article used to lead a victim to reasonably believe it to be a deadly weapon. *See* Tenn. Code Ann. §§ 39-13-401(a), -402(a).

Viewing the evidence in the light most favorable to the state, we conclude the evidence was sufficient to sustain the defendant's convictions for aggravated burglary and aggravated robbery. The evidence established that after the co-defendant threatened Mr. Morgan and his guests, he returned to the house accompanied by three men. The evidence showed that accomplices in the robbery entered the residence of Mr. Morgan without his permission. The evidence further showed that the defendant and one of the accomplices were armed. Mr. Morgan, Mr. Caughlin, Mr. Pennington, and Ms. Lopez were held at gunpoint while accomplices rummaged through the living room. Property was taken from the residence of Mr. Morgan and from the persons of Mr. Morgan and Mr. Caughlin. A watch taken from Mr. Caughlin during the robbery was later found in the co-defendant's bedroom. The defendant was identified by Mr. Morgan in a photographic lineup days after the robbery as having had a gun during the robbery on July 24, 2004. The testimony of Mr. Caughlin, Mr. Pennington, Ms. Lopez, and the co-defendant regrading the events of July 23rd and 24th corroborated Mr. Morgan's identification of the defendant in the commission of the crimes. The state may prove a defendant's guilt based on his criminal responsibility for another person's conduct. *See State v. Mickens*, 123 S.W.3d at 389-90. Therefore, we conclude that evidence was sufficient to support the defendant's convictions. The defendant is without relief on this issue.

IV. Admissibility of Impeachment Evidence

The defendant also asserts that the trial court committed reversible error in refusing to allow defense counsel to cross-examine the co-defendant on efforts to negotiate a plea agreement with the state. The state asserts that "the record contained no evidence, either explicit or implicit, that the prosecutor offered [the co-defendant] a plea deal."

We review questions regarding the admissibility of evidence only for abuse of discretion resulting in an unfair trial and will not reverse the trial court's ruling absent a showing of such abuse. *See State v. Stout*, 46 S.W.3d 689, 697 (Tenn. 2001); *State v. Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997). " 'Relevant evidence' means any evidence having any tendency to make the existence of any

fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Evidence of the co-defendant's attempt to enter into a plea agreement might be relevant to show bias or be used to impeach the credibility of the co-defendant's testimony. However, as pointed out by the trial court, the record contains no basis for defense counsel's suggestion that the co-defendant entered into plea negotiations with the state. Defense counsel attempted to cross-examine the co-defendant with the inquiry, "you tried to work out a deal with the State, didn't you?" The prosecutor's objection to the question was sustained. In an offer of proof that followed, the co-defendant acknowledged that he had an expectation of a plea offer from the state. However, the co-defendant denied his motive in cooperating was the possibility of a deal with the state and claimed he assisted the state because he wanted to tell the truth. Counsel for the co-defendant confirmed that the state never offered a deal for leniency and that there had been no plea negotiations between the state and the co-defendant. The court ruled that questions regarding the motive of the co-defendant were admissible but limited the questioning to exclude any suggestion of plea negotiations. The jury returned and cross-examination of the co-defendant continued. When questioned regarding his motive, the co-defendant testified that he assisted the state in an effort to be truthful.

Our review of the record reveals that the trial court did not prevent defense counsel from asking the co-defendant about his conversations with the state and did not prevent defense counsel from cross-examining the co-defendant regarding his motive in cooperating with the state. Instead, the trial court did not allow an inquiry suggesting that plea negotiations had been held between the state and the co-defendant finding no basis in the record for such inquiry. While evidence of the co-defendant's motive may have been relevant, without a basis in fact, defense counsel's question presented a danger of misleading the jury by suggesting that the co-defendant and the state attempted to negotiate a plea. The offer of proof and statements by co-defense counsel revealed that no negotiations took place between the co-defendant and the state. We conclude that the trial court did not abuse its discretion in barring defense counsel's line of questioning. The defendant is without relief on this issue.

Conclusion

Based on the foregoing, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE

-12-